UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

SHANNON L. MAYO, SR.,                  : CIVIL NO: 1:10-CV-01869
                                       :
            Plaintiff                  :
                                       : (Chief Judge Kane)
      v.                               :
                                       : (Magistrate Judge Carlson)
THE COUNTY OF YORK, *et al.*,          :
                                       :
            Defendants                 :


**REPORT AND RECOMMENDATION**


I.  **Introduction.**

        In this case, the plaintiff, Shannon L. Mayo, Sr.,
presents numerous claims against numerous defendants based on
his detention at the York County Prison while he was a pretrial
detainee.  In this Report and Recommendation, we address a
summary judgment motion filed by six of the remaining
defendants in this action.  As to these defendants we recommend
as follows: First, we recommend that the motion for summary
judgment be granted as to the medical care claims against these
defendants.  Second, we also recommend that the motion be
granted as to the retaliation claims against these defendants,
with the exception of one retaliation claim against one of the
moving defendants.  Finally, we recommend that the motion be
denied as to the conditions-of-confinement claim advanced by

Mayo, since that claim has not been fully developed by the defendants.

## II. Background and Procedural History.

On August 29, 2011, Mayo filed an amended complaint containing numerous claims including claims that the defendants denied him appropriate medical treatment, retaliated against because he filed grievances, subjected him to unconstitutional conditions of confinement, denied him due process in connection with disciplinary proceedings and in connection with his restricted confinement, punished him more severely than other inmates, denied him access to the courts, denied him religious materials, and used excessive force on him. The amended complaint named thirty-six defendants. The defendants fell into two groups: medical staff, including, defendants PrimeCare Medical, Inc., Haskins, Von Kiel, Rochow, Jensen, Misosi, Shafer, Becker, Shannon, Hare, Windon, Mae Baldwin, and Mike Baldwin (medical defendants;) and correctional staff, including defendants York County, Hoke, Sabol, Doll, Buono, Steiner, Reihart, York County Prison Board, Krebs, Weaver, Rohrbaugh,

Daryman, Fink, Ronk, Krinock, Skaggs, Dill, Ison, Fransisco, Straley, Gembe, Wilson, and Scott (county defendants).

At an earlier stage in this litigation, Chief Judge Kane dismissed all claims against defendants Dill, Ison, Von Kiel, Shafer, Becker, Hare, Windon, and Mae Baldwin.[1] Thus, at present there is currently pending and ripe a motion for summary judgment filed by medical defendants Jensen, Miosi, Rochow, Shannon, Haskins, and Mike Baldwin.[2] We address that motion in this Report and Recommendation.[3]

Mayo alleges that he has chronic obstructive pulmonary disease, reactive airway disease, and emphysema. He claims that Dr. Von Kiel prescribed certain medications and treatments for him but that on numerous occasions the other

---

1. Chief Judge Kane dismissed the claims against these defendants without prejudice to Mayo filing a second amended complaint within twenty days. Mayo, however, did not file a second amended complaint.

2. The motion is not brought on behalf of defendant PrimeCare Medical, Inc. Defense counsel erroneously asserts that the court has dismissed PrimeCare Medical, Inc.

3. The county defendants have also recently filed a motion for summary judgment. That motion will be addressed by a separate Report and Recommendation in due course after it is ripe.

medical defendants, who are nurses, physician's assistants, and administrators, failed to provide those medications and treatments as prescribed.  Liberally construed, Mayo alleges the following facts in his amended complaint regarding the remaining medical defendants.

Mayo alleges that, in October of 2009, Dr. Von Kiel prescribed him respiratory medications for nebulizer treatments four times daily and as needed.  He also prescribed prednisone, a Quar inhaler (two puffs twice daily), and an Albuterol inhaler (four times daily or as needed).

According to Mayo defendant Misosi told him that he could call home to have someone bring his nebulizer solutions to the prison and that the medical department would dispense them to him.  In November of 2009, Mayo's fiancé brought numerous medications to the prison, but Mayo alleges he was not provided with some of these medications.

Mayo further contends that, on March 10, 2010, defendant Rochow stopped his nebulizer treatments.  Mayo then filed a grievance, and after a nurse called the physician's

assistant or doctor on call, he was given an emergency nebulizer treatment. A couple of days later, Mayo alleges that he spoke to defendant Misosi about his breathing treatments and she said she was "on it," and, on March 15, 2010, Mayo met with defendant Misosi. According to Mayo, she questioned him about his medical records, which she indicated showed that he had reactive airway disease and asthma but not emphysema. Mayo told her that Dr. Lampher had diagnosed him with the early stages of emphysema, and he questioned her about why defendant Rochow had stopped a medication prescribed by his doctor. According to Mayo, defendant Misosi told him that his treatments were stopped because of his socializing in the medical department, but she also stated that she was only speculating that that was the reason.

Mayo alleges that defendant Jensen responded to his grievance indicating that the nebulizer treatments were stopped because the "provider" felt that he was potentially using too much medication. According to Mayo, Dr. Von Kiel was not aware that defendant Rochow had stopped Mayo's nebulizer treatments, and, on March 17, 2010, when he became aware, he resumed the

nebulizer treatments.  He prescribed the nebulizer medications in two separate vials.

On August 20, 2010, defendant Jensen, under the authority of defendant Doll, moved Mayo to Med Cell 2 and placed him on a medication delivery program that did not give him the option for additional doses of his medications as needed.  Defendant Jensen had Mayo's chart marked "no PRN" medication.  Mayo alleges that Med Cell 2 is only 6½ by 9 feet, that it has no window, that he was in that cell for sixty days, that for over a month he had no outside recreation, that for six weeks he was the only inmate housed in that area, that he had no razor, comb, or brush, that his breakfast and lunch were always cold, that he could clean the cell only once a week, and that he got an infection from the unsanitary toilet in the cell.  According to Mayo, the same medication procedures that he received in Med Cell 2 could have been instituted in the Echo block, known as the hole.  He alleges that there was no need to isolate him in Med Cell 2 and that defendants Jensen, Misosi, and Doll conspired to place him in that cell because of the numerous grievances that he had filed.

According to Mayo, defendant Jensen stopped Mayo's nebulizer treatments while he was in Med Cell 2 because he stepped on and broke an extension cord. Mayo alleges that on one occasion while in Med Cell 2 he woke up wheezing and with labored breathing. A corrections officer called the medical department, and she was told that Mayo's inhalers are to be used four times a day and that Mayo would have to wait until 8:00 a.m. To help expectorate the heavy muscus, Mayo alleges that he had to fill the sink with hot water, put a towel over his head and the sink, and breathe the water vapors. Mayo asserts that he could have had an acute asthma attack and died. He believes that the defendants were trying to kill him.

Mayo alleges that, in August of 2010, defendant Jensen changed his medication so that he received the Albuterol inhaler for only two puffs four times a day, and Jensen mandated that Mayo not receive any other medications including nebulizer treatments. Again, according to Mayo, Dr. Von Kiel was not aware that Mayo's nebulizer treatments had been stopped.

Although not prescribed that way by the doctor, Mayo alleges that on several occasions the solutions for his nebulizer treatments were combined in one vial. According to Mayo, the solutions in the combined vials were not the same strength as the individual vials.

Mayo filed grievances concerning missed treatments and the treatments with the combined vial. He alleges that defendant Mike Baldwin responded by stating that additional treatments outside of the four being given could result in an overdose of medication. Mayo then contends that after they stopped his nebulizer treatments a second time (on September 20, 2010), defendants Jensen, Misosi, and Mike Baldwin prevented him from seeing Dr. Von Kiel. Furthermore, according to Mayo, on one occasion, Mayo had an asthma attack and went to the medical department. Defendant Shannon listened to his lungs and gave him an inhaler, but because of the "No PRN" rule, Mayo alleges that defendant Shannon would not give him anything else.

Mayo then alleges that, on April 2, 2011, he saw defendant Dr. Von Kiel, who permitted him only one nebulizer

treatment. Mayo requested Iprotropium Bromide from defendants Rochow and Von Kiel, but he was told "no." Because his nebulizer treatments were stopped, Mayo alleges that he suffered lung damage as shown by a peak flow meter test. He also alleges that he suffered depression and anxiety about dying from severe coughing and lack of breath.

While in custody Mayo claims that he filed numerous grievances about the provision of his breathing treatments. He also sent a letter to defendant Haskins, the Vice President of PrimeCare Medical, about his nebulizer treatments being stopped. He received a response from Sandra Ulerick, the Director of Risk Management of PrimeCare Medical. She responded that a review of Mayo's medical records revealed that he is receiving treatment appropriate to his condition.

Mayo alleges that he filed a grievance against defendant Mike Baldwin because Baldwin delayed ordering a knee brace for Mayo that Dr. Von Kiel had prescribed. According to Mayo, defendant Baldwin called him into a treatment room and asked him why he had filed a grievance. Mayo alleges that he refused to discuss the matter, and a short time later defendant

Baldwin falsely charged him with calling Baldwin a vulgar name. Mayo alleges that he was put in the "hole" for 45 days because of the charge.

As stated, in this Report and Recommendation we address the motion for summary judgment filed by the medical defendants, defendants Jensen, Miosi, Rochow, Shannon, Haskins, and Mike Baldwin.

## III. Discussion.

### A. Summary Judgment—Standard of Review.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which demonstrate the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Summary judgment is not appropriate when there is a genuine dispute about a material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it will affect the outcome of the trial under governing law. *Id.* A dispute as to a material fact is "'genuine' only if a reasonable jury, considering the evidence presented, could find for the non-moving party." *Childers v. Joseph*, 842 F.2d 689, 693-94 (3d Cir. 1988). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). "If the evidence is merely colorable . . . or is not significantly probative . . . summary judgment may be granted." *Anderson, supra,* 477 U.S. at 249-50. In determining whether a genuine issue of material fact exists, the court must consider all evidence in the light most favorable to the nonmoving party. *White v. Westinghouse Electric Co.*, 862 F.2d 56, 59 (3d Cir. 1988).

At the summary judgment stage, the judge's function is not to weigh the evidence or to determine the truth of the

matter, but it is to determine whether there is a genuine issue for trial. *Anderson, supra,* 477 U.S. at 249.  The proper inquiry of the court "is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.


### B. Medical Care Claims.


As the plaintiff was a pretrial detainee during the relevant times, the Due Process Clause rather than the Eighth Amendment is applicable in this case. *Boring v. Kozakiewicz,* 833 F.2d 468, 471 (3d Cir. 1987)("Pretrial detainees are not within the ambit of the Eighth Amendment but are entitled to the protections of the Due Process clause.").  "The Due Process clause requires the government to provide appropriate medical care." *Id.*


The due process rights of a pretrial detainee are "at least as great" as the Eighth Amendment protections to which a

convicted prisoner is entitled. *City of Revere v. Massachusetts General Hospital*, 463 U.S. 239, 244 (1983). Without determining how much more protection, if any, a pretrial detainee is entitled to above the protection provided to a convicted prisoner, the United States Court of Appeals for the Third Circuit has applied the standards enunciated in Eighth Amendment cases to medical claims by pretrial detainees. *See Boring, supra,* 833 F.2d at 473; *Natale v. Camden Cnty. Corr. Facility,* 318 F.3d, 575, 581 (3d Cir. 2003).

Borrowing from the Eighth Amendment standard, in order for the plaintiff to establish a viable medical care claim he must establish that the defendants acted with deliberate indifference to his serious medical needs. *Estelle v. Gamble*, 429 U.S. 97 (1976). *See also Groman v. Township of Manalapan,* 47 F.3d 628, 637 (3d Cir. 1995)("Failure to provide medical care to a person in custody can rise to the level of a constitutional violation under § 1983 only if that failure rises to the level of deliberate indifference to that person's serious medical needs."). To establish a violation of the constitutional right to adequate medical care in accordance with this standard, the plaintiff is thus required to point to

evidence that demonstrates (1) a serious medical need, and (2) acts or omissions by prison officials that indicate deliberate indifference to that need. *Rouse v. Plantier,* 182 F.3d 192, 197 (3d Cir. 1999).

Deliberate indifference is a subjective standard. *Farmer v. Brennan*, 511 U.S. 825, 840 (1994). "To act with deliberate indifference to serious medical needs is to recklessly disregard a substantial risk of serious harm." *Giles v. Kearney,* 571 F.3d 318, 330 (3d Cir. 2009). To act with deliberate indifference, the prison official must have known of the substantial risk of serious harm and must have disregarded that risk by failing to take reasonable measures to abate it. *Farmer, supra,* 511 U.S. at 837. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.*

The Third Circuit has found deliberate indifference where a prison official: "(1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical

reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment." *Rouse, supra,* 182 F.3d at 197. The Third Circuit has also held that "[n]eedless suffering resulting from the denial of simple medical care, which does not serve any penological purpose, . . . violates the Eighth Amendment." *Atkinson v. Taylor,* 316 F.3d 257, 266 (3d Cir. 2003).

At the same time, it is also clear that the mere misdiagnosis of a condition or medical need, or negligent treatment provided for a condition, is not actionable as a constitutional claim because medical malpractice is not a constitutional violation. *See Spruill v. Gillis,* 372 F.3d 218, 235 (3d Cir. 2004); *Singletary v. Pa. Dep't of Corr.,* 266 F.3d 186, 192 n. 2 (3d Cir. 2002)(claims of medical malpractice, absent evidence of a culpable state of mind, do not constitute deliberate indifference under the Eighth Amendment). Instead, deliberate indifferent represents a much higher standard, one that requires "obduracy and wantonness, which has been likened to conduct that includes recklessness or a conscious disregard of a serious risk." *Rouse, supra*, 182 F.3d at 197 (quoting *Whitley v. Albers,* 475 U.S. 312, 319 (1986)).

"Indeed, prison authorities are accorded considerable latitude in the diagnosis and treatment of prisoners." *Durmer v. O'Carroll,* 991 F.2d 64, 67 (3d Cir. 1993)(citations omitted). Furthermore, in a prison medical context, deliberate indifference is generally not found when some significant level of medical care has been offered to the inmate. *Clark v. Doe,* No.CIV.A. 99-5616, 2000 WL 1522855, at *2 (E.D.Pa. Oct. 13, 2000) ("[C]ourts have consistently rejected Eighth Amendment claims where an inmate has received some level of medical care"). Thus, such complaints fail as constitutional claims under § 1983 since "the exercise by a doctor of his professional judgment is never deliberate indifference.*"* *Gindraw v. Dendler,* 967 F.Supp. 833, 836 (E.D.Pa. 1997). *See also Brown v. Borough of Chambersburg,* 903 F.2d 274, 278 (3d Cir.1990) ("[A]s long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights."). Applying this exacting standard, courts have frequently rejected Eighth Amendment claims that are based upon the level of professional care that an inmate received, *see, e.g.*, *Montilla v. Prison Health Services, Inc.*, 457 F. App'x 212 (3d Cir. 2012); *Brown v. Beard,* 445 F. App'x 453 (3d Cir. 2011); *Ham v. Greer*, 269 F. App'x 149 (3d Cir.

2008); *James v. Dep't of Corrections,* 230 F. App'x 195 (3d.
Cir. 2007); *Gindraw, supra,* 967 F.Supp. at 837, particularly
where it can be shown that significant medical services were
provided to the inmate but the prisoner is dissatisfied with
the outcome of these services. *James, supra,* 230 F. App'x. at
197-98 (citations omitted). In short, any attempt to "second-
guess the propriety or adequacy of a particular course of
treatment" is disavowed by courts since such determinations
remain a question of sound professional judgment. *Inmates of
Allegheny County Jail v. Pierce,* 612 F.2d 754, 762 (3d Cir.
1979) (quoting *Bowring v. Godwin,* 551 F.2d 44, 48 (4th Cir.
1977)).

There is a necessary corollary to this principle,
limiting the reach of the Constitution in a prison medical
setting. In a case such as this, where the inmate received on-
going medical care, it is also well-established that non-
medical correctional staff may not be "considered deliberately
indifferent simply because they failed to respond directly to
the medical complaints of a prisoner who was already being
treated by the prison doctor." *Durmer, supra,* 991 F.2d at 69.
The rationale for this rule has been aptly explained by the

United States Court of Appeals for the Third Circuit in the

following terms:

> If a prisoner is under the care of medical
> experts . . . a non-medical prison official
> will generally be justified in believing that
> the prisoner is in capable hands.  This
> follows naturally from the division of labor
> within a prison.  Inmate health and safety is
> promoted by dividing responsibility for
> various aspects of inmate life among guards,
> administrators, physicians, and so on.
> Holding a non-medical prison official liable
> in a case where a prisoner was under a
> physician's care would strain this division of
> labor.  Moreover, under such a regime, non-
> medical officials could even have a perverse
> incentive *not* to delegate treatment
> responsibility to the very physicians most
> likely to be able to help prisoners, for fear
> of vicarious liability.  Accordingly, we
> conclude that, absent a reason to believe (or
> actual knowledge) that prison doctors or their
> assistants are mistreating (or not treating) a
> prisoner, a non-medical prison official . . .
> will not be chargeable with the Eighth
> Amendment scienter requirement of deliberate
> indifference.

*Spruill v. Gillis,* 372 F.3d 218, 236 (3d. Cir. 2004).


The moving medical defendants contend that they are

entitled to summary judgment on Mayo's deliberate indifference

claims because Mayo's medical records establish that he

received his breathing treatments as prescribed and that any

changes to or discontinuances of his treatments were made by

18

Dr. Von Kiel in the exercise of his sound medical judgment. The medical records relied on by the moving defendants include charts titled as Medication Administration Records. These charts detail medication names and dosages, times and dates, and provider initials, and describe an on-going course of medical treatment afforded to Mayo. As records of on-going medical treatment, these documents are admissible, probative evidence. See Rule 803(4) Fed. R. Evid. Without some explanation, which the defendants have not provided, we cannot conclude that these charts support the defendants' specific assertion that Mayo received his breathing treatments as prescribed and that any changes were made by Dr. Von Kiel. However, these records, taken as a whole, show that Mayo received on-going daily care and medical treatment from the defendants.

In addition to arguing that the medical records affirmatively establish that Mayo received medical care, the moving defendants contend that they are entitled to summary judgment because Mayo has not presented evidence to substantiate, or create a genuine issue of material fact, as to his claims that the defendants were deliberately indifferent to

his serious medical needs by interfering with the orders of Dr. Von Kiel. Mayo responds to this with a declaration. However, most of the statements in the declaration are mere conclusions, coupled with various hearsay assertions. Moreover, some of the statements made by Mayo actually appear to contradict his claim of deliberate indifference. For example, Mayo describes an incident in his declaration in which he notified Dr. Von Kiel that his nebulizer treatments were stopped. According to Mayo, Dr. Von Kiel told him that he was not aware of that and Dr. Von Kiel immediately ordered the treatments restarted. *Doc. 130* at ¶10.[4] This conduct, described by Mayo, rebuts a claim of deliberate indifference on Dr. Von Kiel's part and suggests instead that the doctor was responsive to Mayo's medical complaints.

A party who seeks to resist a summary judgment motion by citing to disputed material issues of fact must show by competent evidence that such factual disputes exist. Further, "only evidence which is admissible at trial may be considered in ruling on a motion for summary judgment." *Countryside Oil*

---

4. Although Mayo does not state in his declaration on what date this conversation with Dr. Von Kiel occurred, it appears that Mayo is asserting that the conversation occurred in connection with the March 2010 temporary discontinuance of his treatments.

*Co., Inc. v. Travelers Ins. Co.,* 928 F.Supp. 474, 482 (D.N.J. 1995). This rule applies with particular force to parties who attempt to rely upon hearsay statements to establish material issues of fact which would preclude summary judgment. With respect to such claims, it is well-settled that: "In this circuit, hearsay statements can be considered on a motion for summary judgment [only] if they are capable of admission at trial." *Shelton v. University of Medicine & Dentistry of N.J.,* 223 F.3d 220, 223, n. 2 (3d Cir. 2000)(citing *Stelwagon Mfg. v. Tarmac Roofing Sys., Inc.,* 63 F.3d 1267, 1275, n. 17 (3d Cir. 1995)). In this regard it has been aptly observed that:

> It is clear that when considering a motion for summary judgement, a court may only consider evidence which is admissible at trial, and that a party can not rely on hearsay evidence when opposing a motion for summary judgment. See *Buttice v. G.D. Searle & Co.,* 938 F.Supp. 561 (E.D.Mo.1996). Additionally, a party must respond to a hearsay objection by demonstrating that the material would be admissible at trial under an exception to hearsay rule, or that the material is not hearsay. See *Burgess v. Allstate Ins. Co.,* 334 F.Supp.2d 1351 (N.D.Ga.2003). The mere possibility that a hearsay statement will be admissible at trial, does not permit its consideration at the summary judgment stage. *Henry v. Colonial Baking Co. of Dothan,* 952 F.Supp. 744 (M.D.Ala.1996).

*Bouriez v. Carnegie Mellon Univ.,* No. 02-2104, 2005 WL 2106582, *9 (W.D.Pa. Aug. 26, 2005). Thus, a party may not rely upon

inadmissible hearsay assertions to avoid summary judgment. Therefore, where a party simply presents inadmissible hearsay declarations in an attempt to establish a disputed material issue of fact, courts have typically rebuffed these efforts and held instead that summary judgment is appropriate. See, e.g., *Synthes v. Globus Medical, Inc.,* No. 04-1235, 2007 WL 2043184 (E.D.Pa. July 12, 2007); *Bouriez v. Carnegie Mellon Univ.,* No. 02-2104, 2005 WL 2106582, *9 (W.D.Pa. Aug. 26, 2005); *Carpet Group Int'l v. Oriental Rug Importers Assoc., Inc.,* 256 F.Supp.2d 249 (D.N.J. 2003).

Mayo's declaration is insufficient to create a genuine issue of material fact and Mayo has not presented other competent evidence in this case from which a reasonable trier of fact could conclude that the moving defendants were deliberately indifferent to his serious medical needs. Furthermore, Mayo's counter-statement of material facts, (Doc. 131), contains a detailed recital of medical encounters with prison medical staff.  While the parties dispute the tone, tenor and sufficiency of the treatment provided in these medical appointments, it is undisputed that these appointments occurred and some level of professional care was afforded to

Mayo.  This is particularly true since it is not in dispute that Mayo was receiving medical care for his conditions throughout his incarceration.  Even during the periods that the nebulizer treatments were stopped, Mayo was still receiving his inhalers.  Although Mayo asserts that he was entitled to additional or different treatment, he has not established that the defendants were deliberately indifferent to his serious medical needs.  Instead, stripped to its essentials, Mayo's claim entails a dispute between an inmate and his health care providers over the precise nature of this treatment; a dispute that turns on a difference of opinion regarding the efficacy of alternate medications.  As a legal matter disputes between inmates and medical professionals concerning which of several available medications to use in treating a specific medical problem simply do not rise to the level of a constitutional infraction involving deliberate indifference to a serious medical need. Thus, when an inmate's claim entails nothing more than a disagreement concerning which type of medication to prescribe for a particular ailment, prison officials are entitled to a judgment in their favor as a matter of law. *See e.g., Gause v. Diguglielmo*, 339 F.App'x 132 (3d Cir. 2009)(dispute over choice of medication does not rise to the

level of an Eighth Amendment violation); *Innis v. Wilson*, 334

F.App'x 454 (3d Cir. 2009)(same); *Whooten v. Bussanich*, 248

F.App'x 324 (3d Cir. 2007)(same); *Ascenzi v. Diaz*, 247 F.App'x

390 (3d Cir. 2007)(same)  Accordingly, the moving defendants

are entitled to summary judgment on the medical care claims.[5]

### C. Retaliation Claims.

Mayo also claims that the medical defendants denied him

prescribed care in retaliation for his filing of grievances,

---

5.  We note that defendant Prime Care has not moved for summary
judgment, because it apparently—and in our view
erroneously—believed that it had been dismissed from this case.
Prime Care seems to be named in this action because it is the
corporate health care provider that contracts to deliver prison
medical care to inmates at the prison where Mayo was housed, and
employs the medical professionals who treated the plaintiff.
However, this general assertion, standing alone, may not be
sufficient to hold Prime Care culpable for any alleged misdeeds by
individual health care providers. Quite the contrary, it is well-
settled that: "Prime Medical is not liable for constitutional
violations committed by its employees, unless Prime Medical has
adopted a policy, practice or custom that caused the constitutional
violations alleged. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658,
690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *see Woodward v. Corr.
Med. Servs.*, 368 F.3d 917, 927 (7th Cir.2004)." *Stankowski v.
Farley*, 251 F. App'x 743, 748 (3d Cir. 2007)(summary affirmance of
dismissal).

and alleges that the he was moved to Med Cell 2 in retaliation for filing grievances.[6]

A prisoner claiming that a defendant has retaliated against him for exercising his constitutional rights must prove that: 1) his conduct was constitutionally protected; 2) he suffered "adverse action" at the hands of the defendant; and 3) his constitutionally protected conduct was a substantial or motivating factor in the decision of the defendant. *Carter v. McGrady,* 292 F.3d 152, 158 (3d Cir. 2002). "Once a prisoner has made his *prima facie* case, the burden shifts to the defendant to prove by a preponderance of the evidence that [he or she] 'would have made the same decision absent the protected conduct for reasons reasonably related to penological interest.'" *Id.* (quoting *Rauser v. Horn*, 241 F.3d 330, 334 (3rd Cir. 2001)).

Causation is a crucial element to any First Amendment retaliation claim; that is, the plaintiff must show a causal

---

6.  Mayo also claims that defendant Mike Baldwin charged him with a misconduct in retaliation for a filing a grievance.  The moving defendants do not address this particular retaliation claim, and, thus, neither do we.

connection between his protected activity and some retaliatory

conduct.  While causation can occasionally be proven directly,

it is often subject to circumstantial proof.  To establish this

crucial component to a constitutional retaliation claim, a

plaintiff must make an exacting showing. In this setting:

> To establish the requisite causal connection a
> plaintiff usually must prove either (1) an
> unusually suggestive temporal proximity
> between the protected activity and the
> allegedly retaliatory action, or (2) a pattern
> of antagonism coupled with timing to establish
> a causal link. *See Krouse v. American
> Sterilizer Co.,* 126 F.3d 494, 503-04 (3d
> Cir.1997); *Woodson v. Scott Paper Co.,* 109
> F.3d 913, 920-21 (3d Cir.1997). In the absence
> of that proof the plaintiff must show that
> from the "evidence gleaned from the record as
> a whole" the trier of the fact should infer
> causation. *Farrell v. Planters Lifesavers Co.,*
> 206 F.3d 271, 281 (3d Cir.2000).

*Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d

Cir. 2007).

Moreover, when examining these causation issues, we are

specifically admonished that:

> A court must be diligent in enforcing these
> causation requirements because otherwise a
> public actor cognizant of the possibility that
> litigation might be filed against him,
> particularly in his individual capacity, could
> be chilled from taking action that he deemed
> appropriate and, in fact, was appropriate.
> Consequently, a putative plaintiff by engaging
> in protected activity might be able to

26

insulate himself from actions adverse to him
that a public actor should take. The point we
make is not theoretical as we do not doubt
that public actors are well aware that persons
disappointed with official decisions and
actions frequently bring litigation against
the actors responsible for the decisions or
actions in their individual capacities, and
the actors surely would want to avoid such
unpleasant events. Thus, it would be natural
for a public actor to attempt to head off a
putative plaintiff with the unwarranted
expenditure of public funds. Courts by their
decisions should not encourage such activity
and, by enforcing the requirement that a
plaintiff show causation in a retaliation
case, can avoid doing so as they will protect
the public actor from unjustified litigation
for his appropriate conduct. In this regard we
recognize that often public actors such as
those in this case must make a large number of
decisions in charged atmospheres thereby
inviting litigation against themselves in
which plaintiffs ask the courts to second
guess the actors' decisions.

*Id.* at 267-68.

The defendants contend that Mayo's retaliation claim

fails because there was a medical reason to place Mayo in Med

Cell 2— i.e, Mayo was refusing and failing to present for his

scheduled treatments and his placement in medical observation

was intended to ensure that he had access to his treatments.

The following facts are not in dispute.  On August 8, 2010, Mayo refused his breathing treatment complaining that it was not the right medication, and he continued to refuse the medication even after the nurse informed him that it was the right medication. *See Doc. 123* at ¶48 and *Doc. 131* at ¶48.  On August 15, 2010, defendant Miosi spoke to Mayo, reviewed his medication times for his nebulizer treatments, and told him that at this time the treatments were routine and are to be taken as scheduled and not as needed. *Id.* at ¶49.  But, on August 16, 2010 and August 17, 2010, Mayo again refused his breathing treatment. *Id.* at ¶50.

Mayo contends that there was no medical reason to place him in Med Cell 2, and he states in his declaration that the defendants placed him in the medical cell because of the grievances that he filed against them and the medical department.  He also states in his declaration that the defendants changed his prescriptions and refused to provide him treatment because of the grievances that he filed.  The statements in Mayo's declaration are conclusory and do not create a genuine dispute of material fact.  Nor do they establish the requisite causal connection a plaintiff must

prove to sustain a retaliation claim by showing either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link. *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007). Further, the undisputed fact that Mayo had refused some treatments prior to his placement in the Med Cell 2 supports that defendants' assertion that they placed him in the medical cell for reasons reasonably related to penological interests. Accordingly, the moving defendants are entitled to summary judgment on the retaliation claims against them except, as noted, the retaliation claim against defendant Mike Baldwin for charging Mayo with misconduct in retaliation for a filing a grievance, which claim the defendants have not addressed.

### D. Conditions-of-Confinement Claim.

The moving defendants also claim that they are entitled to summary judgment as to the due process claim based on Mayo's placement in Med Cell 2.

Again since the plaintiff was a pretrial detainee rather than a convicted prisoner, the Due Process Clause rather than the Eighth Amendment is applicable.  The Third Circuit has emphasized that as to conditions-of-confinement claims the standards applicable to pretrial detainees are different from those applicable to convicted prisoners. *See Hubbard v. Taylor*, 399 F.3d 150, 164 (3d Cir. 2005)(reversing and remanding grant of summary judgment to prison officials on pretrial detainee's conditions-of-confinement claim because the district court improperly analyzed the claim under the Eighth Amendment rather than the Due Process Clause of the Fourteenth Amendment).

The Supreme Court addressed the standard by which conditions of confinement are evaluated under the Due Process Clause for pretrial detainees in *Bell v. Wolfish*, 441 U.S. 520 (1979).  The Court held that the proper inquiry is whether the conditions amount to punishment of the detainee. *Id.* at 535. "For under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." *Id.*  Once an inmate is properly detained to ensure his presence at trial, the government "may subject him to the restrictions and conditions of the detention

facility so long as those conditions and restrictions do not

amount to punishment, or otherwise violate the Constitution."

*Id.* at 536-37.  In determining whether a condition amounts to

punishment:

> [a] court must decide whether the disability
> is imposed for the purpose of punishment or
> whether it is but an incident of some other
> legitimate governmental purpose.  Absent a
> showing of an expressed intent to punish on
> the part of detention facility officials, that
> determination generally will turn on 'whether
> an alternative purpose to which [the
> restriction] may rationally be connected is
> assignable for it, and whether it appears
> excessive in relation to the alternative
> purpose assigned [to it].'  Thus, if a
> particular condition or restriction of
> pretrial detention is reasonably related to a
> legitimate governmental objective, it does
> not, without more, amount to "punishment."
> Conversely, if a restriction or condition is
> not reasonably related to a legitimate goal -
> if it is arbitrary or purposeless - a court
> permissibly may infer that the purpose of the
> governmental action is punishment that may not
> constitutionally be inflicted upon detainees
> *qua* detainees.

441 U.S. at 538-39 (footnotes and citations omitted).


The United States Court of Appeals for the Third

Circuit has distilled the teachings of *Bell* into a two-step

test: 1) whether any legitimate purposes are served by the

conditions; and 2) whether the conditions are rationally

related to those purposes. *Hubbard, supra,* 399 F.3d at 159

(quoting *Union County Jail Inmates v. DiBuono,* 713 F.2d 984,

992 (3d Cir. 1983)).  "In assessing whether the conditions are

reasonably related to the assigned purposes, we must further

inquire as to whether these conditions 'cause [inmates] to

endure [such] genuine privations and hardship over an extended

period of time, that the adverse conditions become excessive in

relation to the purposes assigned to them." *Id.* at 159-60.  The

"inquiry into whether given conditions constitute 'punishment'

must therefore consider the totality of the circumstances

within an institution." *Id. at* 160.


        In their motion, the moving defendants simply combine

Mayo's due process and retaliation claims together, and contend

without further independent analysis that they are entitled to

summary judgment on all of these claims.  They have not,

however, separately addressed the conditions in the medical

cell.  Neither have they discussed the constitutional standards

which apply to such claims by pre-trial detainees.  Nor do they

develop an argument for why they are entitled to summary

judgment on the due process claim.  Accordingly, in the absence

of such pleadings and proof, we conclude that they are not

entitled at this time to summary judgment on the due process conditions-of-confinement claim.

**IV. Recommendations.**

Accordingly, for the foregoing reasons, it is recommended that the motion (doc. 122) for summary judgment filed by defendants Jensen, Miosi, Rochow, Shannon, Haskins, and Mike Baldwin be granted in part and denied in part as follows.  It is recommended that defendants Jensen, Miosi, Rochow, Shannon, Haskins, and Mike Baldwin be granted summary judgment on the medical care claims and the retaliation claims based on the denial of medical care and the placement in the medical cell.  Because the defendants have not separately addressed certain claims, it is recommended at this time: (1) that defendant Mike Baldwin not be granted summary judgment on the claim that he retaliated against Mayo by issuing him a misconduct; (2) that the moving defendants not be granted summary judgment on Mayo's due process conditions-of-confinement claim; and (3) that defendant Prime Care not be dismissed from this action at present.

The Parties are further placed on notice that pursuant to Local Rule 72.3:

> Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 6th day of November, 2012.

_S/Martin C. Carlson_
Martin C. Carlson
Magistrate Judge